UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

----------------------------------------------------------------X

DERRICK PICKETT,                                                    **COMPLAINT**

                              *Plaintiff*,                          Case No.

             - against-                                             **JURY TRIAL DEMANDED**

PANINI AMERICA, INC.,

                              *Defendant*.

----------------------------------------------------------------X

Plaintiff DERRICK PICKETT ("Pickett" or "Plaintiff"), by his attorneys, complaining of

Defendant PANINI AMERICA, INC. ("Panini" or "Defendant"), alleges as follows:

## INTRODUCTION

1.      This Action arises from the policy and practice of Panini (a sports collectibles

company) of discriminating against its non-Caucasian employees for numerous years in violation

of 42 U.S.C. §1981 ("Section 1981"), by promoting a racially hostile work environment for non-

Caucasian employees and deliberately holding back such employees by denying them the same

opportunities of advancement as Panini provides to its Caucasian employees.

2.      Panini's discriminatory practices are even more insulting due to the fact that Panini

relies heavily upon the success of African-American and other non-Caucasian athletes in the sale

of Panini's products (75% or more of Panini's business).

3.      Pickett, who is African-American, clearly was a victim of Panini's discriminatory

practices, including being subject to a racially hostile work environment.

## JURISDICTION

1

4.      This Court has original subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343, as the claims alleged herein arise under the laws of the United States, namely Section 1981.

5.      Venue lies in this District pursuant to 28 U.S.C. § 1391, because Panini resides in Texas, is subject to the personal jurisdiction of Texas courts, and a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this District.

6.      This Court has personal jurisdiction over Panini because Panini's headquarters are in Texas, and the discriminatory conduct alleged herein took place in Texas.  Panini does business in Dallas County, Texas. Its principal place of business is located at 5325 FAA Blvd., Suite 100, Irving, Texas 75061. Panini's contacts with the State of Texas are systematic and continuous, and the acts of discrimination that are the basis for the claims against Panini took place in Dallas County, Texas.

## PARTIES

7.      Plaintiff is an individual residing in Texas and is African-American.

8.      Panini is a corporation organized and incorporated under the laws of Delaware with a principal place of business in Irving, Texas.

## ALLEGATIONS COMMON TO ALL CLAIMS FOR RELIEF

9.      Panini is a company that, among other things, sells trading cards and collectibles using the name and likeness of athletes across the globe.

10.     While the backbone of Panini's business centers upon the accomplishments of numerous world-class athletes, most of which are persons of color, it has steadfastly maintained a policy and practice of denying non-Caucasian employees deserved promotions and equal pay as

2

compared to Caucasian employees, and acquiescing and promoting a racially based hostile work environment for non-Caucasian employees.

11.    Furthermore, non-Caucasian employees are noticeably absent from leadership positions at Panini, which only further evidences that Panini has systematically denied career advancement to people of color.

12.    Additionally, Panini went to great lengths to physically separate Caucasian employees from employees who were people of color.  Specifically, Panini had a vast majority of the non-Caucasian employees working in a storage room, while almost all of the Caucasian employees worked in normal office space outside of the storage room.

13.    Panini management also often labeled non-Caucasian employees as troublemakers who had an "attitude," while never using such derogatory terms when describing Caucasian employees.

14.    The proof will also show that upper management at Panini was a tight-knit group of Caucasian males – the proverbial "good ole boys club," which continuously promoted Caucasian employees and kept racial minorities out of management.

15.    Notably, Panini also failed to have any discrimination complaint procedures and provided employees with no formal avenues to complain about racial discrimination.  Panini also had no anti-discrimination training for employees.

16.    In this regard, in May of 2023, the civil rights group Until Freedom and Black Church PAC issued a letter to Panini and the NBA, NFL, MLB, National Women's Soccer League, MLS, and the NHL (the "Open Letter"), which highlighted Panini's discriminatory hiring and employment practices.

17.     The Open Letter also demanded that Panini institute employment policies that ensure adequate representation and fair treatment throughout its business structure.

18.     Pickett is an African-American who worked for Panini in its Texas location from May 2010 to November 2020.

19.     As with other non-Caucasian employees, Pickett was repeatedly denied advancement.  From 2010 until 2018, when Pickett held the position of Pre-Press Assistant, Pickett applied for and was denied a promotion to the position of Color-Correction Specialist.  Color-Correction Specialist positions were routinely filled by Caucasian employees by word of mouth and openings for these positions were not posted by Panini.

20.     Pickett repeatedly asked his manager, Robert Greinke ("Greinke"), for a promotion to Color-Correction Specialist, including in 2014 and 2015. Greinke continuously denied Pickett the promotion, stating that Pickett was "too good to move up."  Pickett then asked Greinke if he ever had a chance of advancing at Panini, to which Greinke responded: "No."

21.     Pickett was clearly qualified for the Color-Correction Specialist position because he already performed many of the roles of a Color-Correction Specialist and was a fast learner.

22.     Each time Pickett applied for the Color-Correction Specialist position, it was subsequently filled by a Caucasian employee – many of whom were hired externally from Panini and had no experience (let alone Pickett's experience).

23.     In 2016, Pickett applied for the open position of Project Management.  He was qualified for the position but was denied the position.  Panini gave that position to a Caucasian employee with no prior experience at Panini.

24.     In 2016, Pickett also applied for the open position of Writer.  He was qualified for the position but was denied the position.  Panini gave that position to a Caucasian employee with no prior experience at Panini.

25.     But for his race, Pickett would not have suffered such denied promotions.

26.     Panini's continued denial of advancement to Pickett was part and parcel of Panini subjecting Pickett to a racially hostile work environment which constitutes a continuing violation of Section 1981.

27.     Such denials of advancement were due to intentional discrimination.  Such discrimination was systematic and pervasive, it detrimentally affected Pickett, and it would have detrimentally affected a reasonable person of Pickett's race under the same circumstances.  Such discrimination was part of Panini's overall policy and practice of (a) not promoting racial minorities, and (b) harassing non-Caucasian employees based upon their race.  Such discrimination constitutes a continuing violation of Section 1981.

28.     When Panini finally relented after numerous years and gave Pickett a position of Color-Correction Specialist, Greinke did everything he could to make Pickett miserable in order to get Pickett to quit Panini.

29.     For example, Pickett is a member of the Seventh-day Adventist Church, and Greinke criticized Pickett's religious belief that Pickett could not perform secular work on Saturdays (a tenet of the Seventh-day Adventist Church).

30.     Even though Panini Human Resources was aware of Pickett's religious reasons for abstaining from secular work on Saturdays, and informed Greinke of Pickett's beliefs, Greinke continuously teased and criticized Pickett for not working on weekends continuously up and until 2020.

31.     If Pickett were Caucasian, Greinke would not have teased and criticized Pickett for not working on weekends.  But for his race, Pickett would not have suffered such harassment.

32.     From 2018 through 2020, Greinke instructed Pickett's supervisors to come up with pretextual reasons to criticize Pickett's work in order to get Pickett to quit.  On the other hand, Greinke instructed Pickett's supervisors to not criticize the work of Pickett's Caucasian co-employees, but to simply redo the work of such Caucasian employees.  But for his race, Pickett would not have suffered such harassment.

33.     Greinke also told Pickett that he (Greinke) would believe any accusation made against Pickett, even accusations with no proof.  This occurred after a Caucasian employee complained to Greinke that Pickett was purportedly rude to her, which was false.  Pickett defended himself with Greinke and Greinke automatically believed the Caucasian employee.  Pickett stated to Greinke: "You will believe anything they accuse me of," to which Greinke responded: "Yes."

34.     Furthermore, for numerous years and continuing into 2020, Greinke would often racially harass Pickett by referring to him (Pickett) by the wrong name, and then claiming that he (Greinke) referred to Pickett by the wrong name because he just met another African-American by that other name.

35.     Pickett was clearly doing this on purpose because he did it so many times.  Greinke would do this approximately twice a month for multiple years.

36.     In fact, other Panini employees, including a Caucasian Vice President, did the same thing.

37.     These other employees (including a Caucasian Vice President) were in on the act and called Pickett by the wrong name in 2011 through 2014.  Those other Panini employees also mirrored Greinke's conduct by stating that they did so because they knew of another African-

American by that other name. One time, another Caucasian management employee witnessed this and simply said "That's not Tyrone, that's Derrick," without taking any remedial or disciplinary action.

38.    Additionally, in 2013, a Caucasian Panini employee questioned the fact that Pickett was from Hot Springs, Arkansas.  That Caucasian employee stated, "No black people live in Hot Springs," which clearly insinuated that Hot Springs was too affluent for African-Americans. Notably, a Caucasian manager witnessed this racist comment, and gave Pickett a look of surprise, but took no remedial or disciplinary action.

39.    Throughout Pickett's employment, he would often witness Caucasian employees touch African-Americans' hair with astonishment, which belittled those African-American employees because it clearly insinuated that African-Americans' hair was unusual and strange. Indeed, in 2015, a Caucasian employee touched Pickett's hair in the same manner.  Pickett objected, stating "Don't touch my hair," but the practice continued at Panini.

40.    For numerous years and continuing into 2020, Greinke would be hostile to any African-American supervisor above him (Greinke).  He would express such hostility in front of Pickett, which made it abundantly clear that African-Americans would be treated with hostility if they attempted to supervise Caucasian employees.

41.    For numerous years and continuing into 2020, Pickett witnessed numerous non-Caucasian employees forced to work in a storage room, while Caucasian employees were given desks in the normal office space.  This was a clear act of overt racism and segregation.

42.    Such racial harassment was intentional discrimination.  Such discrimination was systematic and pervasive, it detrimentally affected Pickett, it would have detrimentally affected a reasonable person of Pickett's race under the same circumstances.  This discrimination was part

of Panini's overall policy and practice of (a) not promoting racial minorities, and (b) harassing non-Caucasion employees based upon their race. Such discrimination constitutes a continuing violation of Section 1981

43.     Moreover, when Pickett finally obtained a position of Color-Correction Specialist, he was paid less than Caucasian Color-Correction Specialists. For example, two Caucasian Color-Correction Specialists who performed the same tasks as Pickett, LeAnne Branchi and Sarah Harvland, were paid significantly more than Pickett.

44.     Finally, in November 2020, after being employed by Panini for over ten years and routinely being denied promotions due to his race, suffering a racial hostile work environment and witnessing management that was dominated by Caucasians who denied advancement to minorities, Pickett was compelled to quit his job at Panini. Any reasonable person would have felt compelled to resign under the circumstances.

## FIRST CLAIM FOR RELIEF

*(Hostile Work Environment in Violation of Section 1981)*

45.     Plaintiff repeats and realleges all of the allegations set forth above as if fully restated in this Paragraph.

46.     As set forth in detail above, Defendant discriminated against Pickett and harassed him on the basis of his race (African-American).

47.     As demonstrated above, the harassment and discrimination suffered by Pickett was intentional and malicious, and it constituted a continuing violation. It was extraordinarily severe and altered the conditions of Pickett's working environment because it created an atmosphere of abuse and intimidation wherein Pickett's own supervisors participated and condoned the racist misconduct, and it led to Pickett's constructive discharge.

48.     As described above, Pickett's supervisors used their authority to create and continue the discriminatory abusive working environment and failed to take any appropriate remedial action.

49.     As a result, Pickett is entitled to compensatory damages for, *inter alia*, emotional distress, loss of enjoyment of life and other non-pecuniary losses in the maximum amount permitted by the law, as well as pay equal to similarly situated Caucasian employees.

50.     Because Defendant acted with malice and reckless indifference to Pickett's federally protected rights, Pickett is entitled to punitive damages in an amount to be determined at trial, but not less than the maximum amount permitted by law.

51.     Pickett is also entitled to reasonable attorney's fees and expenses to the extent permitted by law.

## SECOND CLAIM FOR RELIEF

*(Constructive Discharge
in Violation of Section 1981)*

52. Plaintiff repeats and realleges all of the allegations set forth above as if fully restated in this Paragraph.

53. As set forth in detail above, Defendant discriminated against Pickett, harassed him on the basis of his race, and created a hostile work environment.

54. In 2020, after being employed by Panini for over ten years and routinely being denied promotions due to his race, suffering a racial hostile work environment and witnessing management that was dominated by Caucasians who denied advancement to minorities, Pickett was compelled to quit his job at Panini.

55. Any reasonable person would have felt compelled to resign under the circumstances.

56. As a result, Pickett is entitled to compensatory damages for, *inter alia*, lost wages and income, emotional distress, loss of enjoyment of life and other non-pecuniary losses in the maximum amount permitted by the law.

57. Because Defendant acted with malice and reckless indifference to Pickett's federally protected rights, Pickett is entitled to punitive damages in an amount to be determined at trial, but not less than the maximum amount permitted by law.

58. Pickett is also entitled to reasonable attorney's fees and expenses to the extent permitted by law.

**WHEREFORE**, Plaintiff demands Judgment as follows:

A.    Plaintiff's actual damages and punitive damages as determined at trial;

B.    Reasonable attorney's fees and expenses;

C.    Costs and disbursements; and

D.    Such other and further relief as deemed just and proper by this Court.

Dated: December 6, 2023

Respectfully submitted,

**GREG McALLISTER**
State Bar No. 24071191
mcallister@roggedunngroup.com

**ROGGE DUNN GROUP, PC**
500 N. Akard Street
Suite 1900
Dallas, Texas 75201
Telephone: (214) 888-5000
Facsimile: (214) 220-3833

**ATTORNEYS FOR PLAINTIFF**

11